UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA, GREENVILLE DIVISION

| | |
|---|---|
| DAVID PILL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SPAN-AMERICA MEDICAL SYSTEMS, INC., THOMAS D. HENRION, JAMES D. FERGUSON, RICHARD C. COGGINS, ROBERT H. DICK, THOMAS F. GRADY, JR., DAN R. LEE, DR. LINDA D. NORMAN, TERRY ALLISON RAPPUHN, THOMAS J. SULLIVAN, SAVARIA CORPORATION, and SAVARIA (SC), INC.,<br><br>Defendants. | Civil Action No. 6:17-cv-01375-MGL<br><br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff David Pill ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.    This action stems from a proposed transaction announced on May 1, 2017 (the "Proposed Transaction" or "Merger"), pursuant to which Span-America Medical Systems, Inc. ("Span" or the "Company") will be acquired by Savaria Corporation ("Parent") through its wholly owned subsidiary, Savaria (SC), Inc. ("Merger Sub") (collectively, "Savaria").

2.    On May 1, 2017, Span's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Savaria. Pursuant to the terms of the Merger Agreement, Savaria commenced a tender offer (the "Tender Offer") to purchase all of the issued and outstanding shares of Span common stock for $29.00 in cash per share, or approximately $80 million in total consideration

(the "Offer Price").  The Tender Offer is set to expire at 5:00 p.m., New York City Time, on Thursday, June 15, 2017.

3.      As alleged herein, the Proposed Transaction is the product of a flawed sales process that favored Salvaria at the expense of Span's shareholders.  Specifically, Defendants did not conduct any pre-signing market check; entered into an extremely restrictive letter of intent (defined below as the "LOI") with Savaria that prohibited the Company from negotiating with alternative potential acquirors; agreed to restrictive deal protection devices that make it highly unlikely that any competing offer to acquire the Company will emerge; initially declined to engage in discussions with a legitimate alternative acquiror (defined below as "Company A"); and engaged a conflicted financial advisor, Robert W. Baird & Co. ("Baird"), which stands to receive $1.3 million, or over 70% of its total compensation for advising the Company, if the Proposed Transaction is consummated.

4.      Moreover, the Tender Offer price is grossly inadequate and substantially undervalues Span, whereby it: is below the mean and median implied values based on Net Sales LTM that Baird calculated for Span; represents a 10.7x Enterprise Value/LTM EBITDA multiple, which is below the 16.9x Enterprise Value/LTM EBITDA from Bloomberg using Span's Standard Industrial Classification (defined below as "SIC") code; and does not account for the "significant synergies" that exist between Span's and Savaria's businesses.

5.      By entering into the flawed sales process at an inadequate Offer Price, and by aiding-and-abetting such breaches, Defendants breached their fiduciary duties to Span's shareholders pursuant to The South Carolina Business Corporation Act of 1988, S.C. Code Ann. § 33-1-101, *et seq*.

6.     On May 17, 2017, Defendants filed a Solicitation/Recommendation Statement on Form 14D-9 (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  As described herein, the Solicitation Statement omits material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

7.     Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' wrongdoing described herein.

### JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(e), 14(d), and 20(a) of the Exchange Act.

9.     This Court has supplemental jurisdiction over Plaintiff's state law claims for breach of fiduciary duties pursuant to 28 U.S.C. § 1367, as such claims relate to Plaintiff's federal claims and form part of the same case or controversy under Article III of the U.S. Constitution.

10.     This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, and maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper under 28 U.S.C. § 1391 because Span maintains its principle executive offices in this District, each Defendant transacted business in this District, and a

substantial portion of the transactions and wrongs complained of herein occurred in this District. Venue is also proper pursuant to the Company's forum selection by-law, Article XII to the Company's Amended and Restated Bylaws.

## PARTIES

12.     Plaintiff is, and has been continuously through all times relevant hereto, the owner of Span common stock.

13.     Defendant Span is a South Carolina corporation and maintains its principal executive offices at 70 Commerce Center, Greenville, South Carolina, 29615.  Span's common stock is listed and traded on The NASDAQ Global Market under the symbol "SPAN."

14.     Defendant Thomas D. Henrion ("Henrion") has served as a director of Span since 1996 and is the Chairman of the Board.

15.     Defendant James D. Ferguson ("Ferguson") has served as a director of Span since 1998 and is the Company's President and Chief Executive Officer ("CEO").

16.     Defendant Richard C. Coggins ("Coggins") has served as a director of Span since 1993 and is the Company's Chief Financial Officer ("CFO"), Vice President of Finance and Secretary.

17.     Defendant Robert H. Dick ("Dick") has served as a director of Span since 1999.

18.     Defendant Thomas F. Grady, Jr. ("Grady") has served as a director of Span since 1975.

19.     Defendant Dan R. Lee ("Lee") has served as a director of Span since 2008.

20.     Defendant Dr. Linda D. Norman ("Norman") has served as a director of Span since 2006 and is the Vice-Chair of the Board.

21.     Defendant Terry Allison Rappuhn ("Rappuhn") has served as a director of Span since 2016.

22.     Defendant Thomas J. Sullivan ("Sullivan") has served as a director of Span since 2015.

23.     Defendants Henrion, Ferguson, Coggins, Dick, Grady, Lee, Norman, Rappuhn, and Sullivan are collectively referred to as the "Individual Defendants."

24.     Defendant Parent is an Alberta, Canada corporation with its principal executive office located at 4350 Chomedey Highway, Laval, Quebec, Canada.  Parent designs, manufactures, distributes and installs accessibility equipment for the elderly and disabled, such as stairlifts for straight and curved stairs, vertical and inclined wheelchair lifts, as well as elevators for home and commercial use.  It also converts and adapts vehicles to be wheelchair accessible.

25.     Defendant Merger Sub is a South Carolina corporation and an indirect wholly owned subsidiary of Parent.

**SUBSTANTIVE ALLEGATIONS**

*Background of the Company and the Proposed Transaction*

26.     Founded in 1970, Span manufactures and sells therapeutic support surfaces and pressure management products for the medical market, as well as medical beds and related in-room furnishing products for the long-term care market.  Span also supplies custom foam and packaging products to the consumer and industrial markets.

27.     On February 2, 2017, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2017, which ended on December 31, 2016.  The Company touted "excellent performance from [the] medical business in the first quarter of fiscal 2017," with "strong sales growth," improved overall profit margins due to a "more profitable sales mix," and "solid progress in adding new customers."  The Company also reported overall declines in net

sales and net income on a year-over-year basis, but attributed much of that relative decline to "a non-recurring seasonable promotion in the first quarter of fiscal 2016" that was not repeated in the first quarter of 2017.

28.     According to Defendant Ferguson, the Company's overall "outlook for fiscal 2017 remain[ed] positive," as it "expect[ed] our more profitable medical sales segment to benefit from higher demand for our therapeutic support surfaces and medical beds, including higher sales in Canada and from our export business." In addition, the Company expected that "earnings for the remainder of fiscal 2017 will benefit from continued strength in medical sales combined with lower administrative costs."

29.     On May 4, 2017, the Company issued a press release announcing its financial results for the second quarter of fiscal year 2017, which ended on April 1, 2017. For the second quarter, the Company reported net sales of $15.2 million, an increase of 3% on a year-over-year basis. Net income for the second quarter was $1.7 million, an increase of 126% on a year-over-year basis, in part due to "higher sales volume in the medical segment" and "a more profitable sales mix." Net income per diluted share for the second quarter was $0.62, an increase of 121% on a year-over-year basis.

30.     Notwithstanding the positive results and outlook for the Company discussed above, the Board caused the Company to enter into the Merger Agreement, pursuant to which Span will be acquired for inadequate consideration in a transaction that benefits Savaria at the expense of the Company and its shareholders.

31.     On May 1, 2017 Span issued a press release announcing the Proposed Transaction, which provided in pertinent part:

> GREENVILLE, S.C.--Span-America Medical Systems, Inc. (NASDAQ: SPAN) announced today that it has reached an agreement to be acquired by

Savaria Corporation, an Alberta, Canada corporation ("Savaria") (TSX:SIS). Savaria intends to acquire Span-America by way of an all-cash tender offer for $29 per share, or approximately $80.2 million. The transaction is expected to close in the second calendar quarter of 2017.

Tom Henrion, Chairman of Span-America's board of directors, said, "The Board of Directors of Span-America unanimously approved the proposed acquisition of Span-America by Savaria. The proposed all-cash tender offer of $29 per share represents an immediate and substantial cash value as well as a significant premium over our stock price, and we believe it fully values the company for our shareholders. Savaria's offer reflects the value that our management and employee team has created for our shareholders. All of Span-America's board members and senior managers have agreed to tender their shares in the tender offer."

\*     \*     \*

**Structure and Terms**

Under the terms of the transaction, Span-America shareholders will receive $29 in cash per share. This represents a premium of 33% to Span-America's closing share price on NASDAQ on April 28, 2017, the last full trading day prior to the announcement date of the Transaction, and a premium of 33% to Span-America's 20-day volume weighted average closing price, calculated as at April 28, 2017. Savaria has indicated that it will finance the transaction with cash on hand, a financing commitment from National Bank of Canada and a Canadian equity private placement of subscription receipts.

The transaction is subject to customary closing conditions, including receipt of two-thirds of Span-America's shares on a fully diluted basis in a tender offer to Span-America' shareholders. All of the members of Span-America's board of directors and its senior officers have entered into tender support agreements with Savaria committing, subject to certain conditions and exceptions, to tender (without a right of withdrawal) all of their Span-America shares, constituting in aggregate approximately 15.9% of its outstanding shares. Following the successful completion of the tender offer, Savaria will acquire all remaining shares not tendered in the tender offer through a second-step merger at the same price per share as that payable under the offer. The transaction is expected to close in the second calendar quarter of 2017.

\*     \*     \*

**Advisors**

Robert W. Baird & Co. served as Span-America's financial advisors and Wyche, P.A. served as Span-America's legal counsel for the transaction.

### The Inadequate Offer Price

32.     The Offer Price is unfair and grossly inadequate because, among other things, the intrinsic value of Span's common stock is materially in excess of the amount offered given the Company's prospects for future growth and earnings.

33.     For example, Span's financial advisor, Baird, conducted a Selected Transactions Analysis and calculated implied values per share for Span based on both Net Sales LTM and EBITDA LTM.  The mean and median implied values per share Baird calculated for Span under the Net Sales LTM were $29.34 per share and $29.13 per share, respectively.  Both values are above the $29.00 Offer Price.

34.     In addition, the Offer Price represents a 10.7x Enterprise Value/LTM EBITDA multiple, which is below the 16.9x Enterprise Value/LTM EBITDA from Bloomberg using Span's Standard Industrial Classification ("SIC") code.  Using the 16.9x multiple for Span results in a price per share that is significantly above the Offer Price of $29.00 per share.

35.     The Offer Price is also inadequate because it does not account for the "significant synergies" that exist between Span's and Savaria's businesses, which are touted in the Solicitation Statement as a primary benefit of the Proposed Transaction.

36.     For example, during the sales process, Savaria "express[ed] enthusiasm regarding the potential synergies between [it] and Span-America," and the Individual Defendants later noted that Savaria "spent a lot of time [during its due diligence visits to Span] asking about potential synergies."  According to Savaria's press release announcing the Proposed Transaction, the value of these synergies to Savaria is significant:

> This acquisition delivers three key benefits that will help Savaria achieve its long-term strategic growth objectives. Firstly, it adds a complementary product line to our accessibility portfolio. Secondly, it provides Savaria with a new distribution channel into the institutional and government markets, which will

complement our existing dealer network and Silver Cross retail outlets. Finally, it increases our presence in the US, allowing us to be closer to 50% of our current business. We are excited to announce this pivotal acquisition, and will eagerly welcome Span-America employees to the Savaria family.

37.     Although the Solicitation Statement claims that the Offer Price "captured a significant portion of the value of these synergies for Span-America's stockholders," Span's financial advisor, Baird, admits that it did "not consider[] any strategic, operating or cost benefits and/or synergies that might result from the Transactions in its analysis."

38.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business and future growth.

***The Flawed Sales Process***

39.     The sales process that resulted in the Proposed Transaction was flawed (and, as described below, the description of the process contained in the Solicitation Statement is false and/or misleading).  According to the Solicitation Statement, the Individual Defendants failed to take any measures to solicit, respond to, or consider, acquisition proposals from potential alternative acquirors.

40.     Specifically, during the nearly six months that the Company was negotiating the terms of the Proposed Transaction with Savaria, the Individual Defendants decided not to conduct any pre-signing market check—whether formal or "soft"—to gauge interest from alternative acquirors.  As described more fully below, the Individual Defendants also took steps to prevent the Company from receiving any alternative acquisition proposals after the Merger Agreement was signed.  This included deciding to forgo any "active 'go-shop'" post-signing market check, and instead agreeing to a "passive 'window shop'" post-signing market check, which included a "no solicitation" provision and restrictive "fiduciary out" with "matching rights."

41.     The Individual Defendants also caused the Company to enter into an extremely restrictive letter of intent ("LOI") with Savaria that prohibited the Company from discussing, negotiating, soliciting, or responding to any expressions of interest from alternative potential acquirors for the final two-and-a-half months of the negotiations until just after the Merger Agreement was signed.   According to the Solicitation Statement:

> On March 17, 2017, Parent and Span-America entered into a letter of intent (the "LOI"), whereby, in connection with discussions regarding a possible transaction between Parent and Span-America, Parent and Span-America agreed that for thirty (30) days after the beginning of Parent's due diligence regarding Span-America and in no event later than the end of the 40th day following the execution of the LOI, Span-America would (i) cease any discussions or negotiations between Span-America and any third party regarding the sale of all or a substantial portion of the stock or assets of Span-America or any offering of debt or equity securities of Span-America (as further described and defined in the LOI, an "Alternative Transaction"); (ii) not initiate or solicit any proposals or offers or engage in any negotiations for an Alternative Transaction; and (iii) notify Parent of any communications Span-America receives from a third party regarding an Alternative Transaction. On April 27, 2017, Parent and Span-America entered into an amendment of the LOI extending the restrictions on Span-America until May 3, 2017.

42.     Although the Individual Defendants created a "Special Committee" of "independent" directors, ostensibly to oversee the sales process, the Special Committee was anything but independent.  For example, the Special Committee retained the Company's and the whole Board's legal counsel, Wyche, P.A. ("Wyche"), and financial advisor, Baird, without attempting to find alternative, independent representatives.  In addition, nearly every meeting of the Special Committee included "most of the other directors" of the Board.  Indeed, in one of its first meetings, the Special Committee discussed, with "all of the other directors" present, "the general process for negotiating with Parent."

43.     Perhaps most egregiously, when the Company's President and CEO, Defendant Ferguson, received two requests to meet with the CEO of a potential strategic acquiror with which he had previously discussed (years earlier) possible business combinations ("Company A"),

Defendant Ferguson "declined." According to the Solicitation Statement, the requests were made sometime "in early 2017," which was just as Merger negotiations with Savaria were beginning and before the Company determined not to conduct a market check and before it signed the restrictive LOI with Savaria.

44.     Defendant Ferguson's decision not to engage in any discussions with Company A in early 2017 is in sharp contrast to Defendant Ferguson's extremely positive response to Savaria's early requests to speak with him—via an unsolicited e-mail from Savaria's Vice President for Corporate Development—in late 2016. In response to *that* request, the Solicitation Statement explains that "Mr. Ferguson replied to the e-mail the following day" and a meeting took place a few weeks later with more formal Merger discussions continuing from there.

45.     In mid-April 2017, less than a month before the Merger Agreement was signed, Company A's CEO made a third request to meet with Defendant Ferguson. This time, Defendant Ferguson accepted the meeting request. At that meeting, Company A's CEO "expressed an interest in acquiring Span-America for cash at a premium over market." However, due to the terms of the LOI, Defendant Ferguson was prohibited from actively engaging in any Merger negotiations with Company A. As the Solicitation Statement explains, "[c]onsistent with the exclusivity obligations in the LOI, Mr. Ferguson merely advised Company A's CEO that he would pass along the information to Span-America's Board."

46.     Ultimately, the Individual Defendants determined, without speaking again with Company A, that Company A was "unlikely" to make an offer that was superior to Savaria's. The Individual Defendants also decided that Span should not even "seek an opportunity to discuss a potential strategic transaction with Company A prior to announcing a transaction with Parent."

This was consistent with the Individual Defendants' decision to not conduct any pre-signing market checks or to allow themselves to negotiate with any potential alternative acquirors.

47.     The Solicitation Statement expressly recognizes that one of the "risks" or "potentially adverse factors" in agreeing to the Proposed Transaction with Savaria was:

> the fact that certain terms of the Merger Agreement prohibit Span-America from actively soliciting third-party bids and from accepting, approving, or recommending third-party bids except in certain limited circumstances, which terms could reduce the likelihood that other potential acquirers (including Company A) would propose an alternative transaction that may be more advantageous to Span-America's stockholders.

48.     According to the Solicitation Statement, the Board considered conducting a pre-signing market check and/or pushing Savaria to include in the Merger Agreement less restrictive conditions that enabled them to seek out alternative acquirors during and after the sales process, but declined to do so because of its "belief, based on, among other things, its familiarity with Span-America's business, the markets in which Span-America operates, an analysis of potential acquirers (including Company A) and its discussions with representatives of Baird, that it was unlikely that there were other potential buyers that would be willing to acquire Span-America at a purchase price higher than the Offer Price of $29.00 per Share."

49.     However, in light of the other information provided in the Solicitation Statement and as discussed in part herein, this "belief" is suspect.  Specifically, the Board *knew*, while it was negotiating the Merger Agreement with Savaria, that Savaria was particularly interested in obtaining the valuable synergies it could realize as a result of the Proposed Transaction.  Defendants Ferguson and Coggins "noted that Parent spent a lot of time asking about potential synergies" during due diligence visits.  Defendant Ferguson also knew that the CEO of Company A—"another company in a related industry to Span-America"—had previously

discussed a potential business combination with him and tried multiple times to renew those discussions during the sales process.

50.    Thus, rather than acceding to Savaria's demands to speed up the sales process and to prohibit the Company from seeking any alternative acquirors, the Individual Defendants should have leveraged the fact that an alternative strategic acquiror (Company A) was trying to enter the sales process and potentially steal the synergies Savaria so highly valued for itself, and used it to push back against Savaria's demands and obtain a better Offer Price and/or less onerous deal conditions (or perhaps engaged in an alternative transaction at a higher price with Company A).

51.    To the extent that Span favored a transaction with Savaria over one with Company A at a higher offer price because Savaria (but not Company A) was willing to keep in place Span's management and employees after the consummation of the Merger, that would be a breach of the Individual Defendants' fiduciary duties to obtain the highest price possible for Span's shareholders.  Indeed, according to Span's "Employee FAQ" filed as an exhibit to the Solicitation Statement, if the Proposed Transaction is consummated, "Savaria intends to keep the current management team [of Span] in place for the immediate future," "intends to maintain Span-America's Greenville, South Carolina and Beamsville, Ontario manufacturing facilities and offices," and "[intends] to maintain Span-America's sales force."

52.    Further tainting the sales process, the Individual Defendants' financial advisor, Baird, was highly incentivized to ensure that the Company reached a deal with Savaria and that the Proposed Transaction and Tender Offer were successful.  According to the Solicitation Statement, "a significant portion"—over 70% of Baird's $1.8 million transaction fee, or $1.3 million—"is contingent upon the consummation of the Transactions."  This created a conflict of interest whereby Baird was more focused on getting the deal done rather than on providing neutral

advice, which very well could have included a recommendation for the Company to remain independent, or to seek alternative acquirors via a market check.

53.     Indeed, according to the Solicitation Statement, although "[t]he topic of soliciting third party indications of interest was discussed among representatives of Baird, Span-America and Span-America's legal advisors . . ., Baird was not requested to, and Baird did not, solicit third party indications of interest in acquiring all or any part of Span-America."

***The Onerous Deal Protection Devices***

54.     As a result of the flawed Merger negotiation process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that benefit Savaria at the expense of the Company and its shareholders by, among other things, locking up the Proposed Transaction and ensuring that no competing offers for the Company will emerge.

55.     For example, Section 6.3(a)-(b) of the Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from taking any affirmative steps to explore or obtain a better offer for the Company's shareholders by means of an alternative acquisition proposal, and by prohibiting them from soliciting, initiating, encouraging or facilitating any such proposal.

56.     Section 6.3(c)-(e) of the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Savaria "matching rights" with respect to any superior proposal made to the Company, of which Savaria must be provided unfettered access to confidential information contained therein so that it can prepare a matching bid.

57.     Matching rights serve the purpose of not just giving the initial bidder—Savaria in this case—a last-look option to increase its offer; they also deter alternative bids from coming

forward in the first place. Potential alternative bidders will rationally understand that they cannot truly "win" in a situation where the initial bidder has matching rights, as there are only two possible outcomes, both bad from its perspective. Either the new bidder will bid and win, in which case it has paid more than the more informed initial bidder (who has already completed due diligence and has an informational advantage/head start), or it will conduct due diligence and could ultimately lose anyway when the original bidder has a chance to match or improve its offer, in which case it has nothing to show for its efforts. In this way, matching rights deter alternative acquisition proposals.

58.     The Individual Defendants also agreed to Savaria's requirement that any deal must include Tender Support Agreements from all of Span's directors and executive officers (including the Individual Defendants named herein), pursuant to which they have pledged to tender their shares. The combined shareholdings subject to such agreements total approximately 15.9% of the outstanding shares of the Company's common stock. This further ensures the success of the Tender Offer at this inadequate price.

59.     Section 8.2 of the Merger Agreement provides for a "termination fee" of $2,825,000, payable by the Company to Savaria if the Individual Defendants cause the Company to terminate the Merger Agreement to pursue a superior proposal. The termination fee further deters other potential suitors from making a superior offer for the Company, as any competing bidder would have to pay a naked premium for the right to provide Span's stockholders with a superior offer.

60.     The Individual Defendants' acceptance in the Merger Agreement of onerous post-closing deal protections that foreclose competing acquirors from stepping forward is particularly egregious in light of the fact that they knew, before the Merger Agreement was signed, that

Company A was interested in exploring a potential alternative acquisition. According to the Solicitation Statement, the Individual Defendants chose not to engage in any discussions with Company A before signing the Merger Agreement because they believed that "the 45-day post-announcement 'window shop' period would provide Company A with an adequate opportunity to make a topping offer." The Individual Defendants similarly concluded that, as a general matter, "a passive post-closing market check was sufficient to obtain any reasonably possible topping offers." As just discussed, those conclusions were not accurate.

***The Solicitation Statement's Material Misrepresentations/Omissions***

61.     Although the Solicitation Statement provides Span's stockholders with a summary/overview of the Proposed Transaction, it omits certain critical information which renders portions of the Solicitation Statement materially incomplete and/or misleading, in violation of the Securities Act provisions discussed herein and in breach of the Defendants' fiduciary duties. As a result, Span's stockholders lack material information necessary to allow them to make an informed decision concerning whether to tender their shares.

62.     The Solicitation Statement fails to provide material information concerning the sales process conducted by the Board and the events leading up to the signing of the Merger Agreement. In particular, the Background of the Offer and the Merger section contained on pages 13-21 of the Solicitation Statement is materially deficient in that it fails to disclose the following information:

    a.     The Solicitation Statement does not disclose why the Board believed it necessary to create a Special Committee "comprised of four independent directors" in a purportedly arm's-length transaction with no reported conflicts of interest.

    b.     The Solicitation Statement does not disclose what powers and authority the Special Committee was imbued with by the Board.

16

c. The Solicitation Statement does not disclose why, after feeling the need to create a Special Committee "comprised of for independent directors," the other members of the Board were permitted to participate in almost all Special Committee meetings.

d. The Solicitation Statement does not disclose why Defendant Ferguson declined Company A's CEO's repeated requests to meet in early 2017, or whether Defendant Ferguson ever discussed these requests with the other Board members or the Board's advisors, either at the time they were made or after he rejected them.

e. The Solicitation Statement does not disclose whether a transaction with Company A—which is described as "another company in a related industry to Span-America"—could have resulted in "synergies," and, if so, whether the Board failed to consider that possibility and/or improperly favored entering into a transaction with Savaria over one with Company A that may have yielded a higher offer price for Span's shareholders.

f. The Solicitation Statement does not disclose whether the Company or its representatives, or Savaria or its representatives, had any discussions with Company A aside from the April 13, 2017 meeting between Defendant Ferguson and the CEO of Company A.

g. The Solicitation Statement does not disclose the basis upon which Defendant Henrion determined that the $27.00 per share offer made by Savaria's Chairman, President and CEO, Marcel Bourassa, on February 23, 2017, was "likely insufficient." The Solicitation Statement does not specify whether Henrion consulted anyone, including the Board's financial advisor or other Board members prior to reaching this conclusion. This calls into question the Special Committee's conclusion, made two weeks later, that "the proposed $27 per share price was towards the top of the price range that Span-America could reasonably expect to receive and that the odds of another party making a 'topping offer' over $27 per share were low."

h. The Solicitation Statement does not disclose whether, during any discussions between Span's senior management and Savaria, any promises or informal agreements of future employment were made, as opposed to any formal agreements being entered into, which the Solicitation Statement states did not occur. Savaria initially conditioned the Proposed Transaction on receiving employment agreements with Span's senior management, and had at least one meeting with management, but later dropped that requirement.

63. The Solicitation Statement also fails to provide material information concerning

Span's management-prepared financial forecasts (i.e., projections) for the Company from Fiscal

Years Ending 2017 through 2021. These projections were "prepared by Span-America's management for purposes of Baird's analysis" and not in the ordinary course of Span's business. After they were "reviewed and approved by the Board" and "furnished to Baird," Baird reviewed and relied upon them "[i]n conducting its financial analyses and in arriving at its [fairness] opinion." These projections are thus crucial to an understanding of the basis of Baird's fairness opinion and the adequacy of the Offer Price.

64. Although the Solicitation Statement contains a summary of management's projections, Defendants have failed to disclose several critical projections that were provided to Baird, including: unlevered free cash flows; net income; after-tax net interest; cash taxes; depreciation and amortization; capital expenditures; changes in working capital; and changes in other operating and investing cash flows.

65. Baird primarily relied on these (omitted) projections in performing its discounted cash flow analysis, in which it "utiliz[ed] Span-America's projected unlevered free cash flows (defined as net income excluding after-tax net interest, plus depreciation and amortization, less capital expenditures and increases in net working capital, plus/minus changes in other operating and investing cash flows) from 2017 to 2021, as provided by Span-America's senior management." Without knowing these projections, Span's stockholders cannot properly consider the value of Span shares and the financial analyses performed by Baird in support of its fairness opinion, which is necessary to make a fully informed decision as to whether to tender their shares.

66. In addition, the Opinion of Span-America's Financial Advisor section contained on pages 25-33 of the Solicitation Statement is materially deficient in that it fails to disclose the following information concerning Baird's financial analyses:

    a.    The Solicitation Statement does not disclose the basis for the discount range selected by Baird in its Discounted Cash Flow Analysis.

b.     The Solicitation Statement does not disclose the selected public company trading multiples for each individual company that Baird used in its Selected Publicly Traded Company Analysis.

c.     The Solicitation Statement does not disclose Span's LTM sales or LTM adjusted EBITDA that Baird used in its Selected Publicly Traded Company Analysis.

d.     The Solicitation Statement does not disclose the selected transaction multiples for each transaction that Baird used in its Selected Transactions Analysis.

e.     The Solicitation Statement does not disclose Span's LTM sales or LTM adjusted EBITDA that Baird used in its Selected Transactions Analysis.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Span (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

68.     This action is properly maintainable as a class action for the following reasons:

a.     The Class is so numerous that joinder of all members is impracticable.  As of May 1, 2017, there were 2,764,625 shares of Span common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

b.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(d), 14(e), and 20(a) of the Exchange Act in connection with the Proposed Transaction; (ii) whether Defendants have breached their fiduciary duties owed to Plaintiff and the Class and/or aided and abetted such breaches; and (iii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Solicitation Statement as currently composed.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy;

g.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

## CAUSES OF ACTION

### COUNT I

**Claim for Violation of Section 14(e) of the Exchange Act**
**(Against All Defendants)**

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

20

71.    Defendants prepared, reviewed, filed and disseminated the false and misleading Solicitation Statement to Span's shareholders.

72.    In doing so, Defendants knew or recklessly disregarded that the Solicitation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.    The omissions and incomplete and misleading statements in the Solicitation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

74.    Specifically, as discussed herein, the Solicitation Statement misrepresented and/or omitted material facts concerning, *inter alia*, the sales process, and the value of Span shares and the financial analyses performed by Baird in support of its fairness opinion.

75.    By virtue of their positions within the Company and/or roles in the process and in the preparation of the Solicitation Statement, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing Baird's complete financial analyses purportedly summarized in the Solicitation Statement.

76.    Defendants also knew that Plaintiff and the other members of the Class would rely upon the Solicitation Statement in determining whether to tender his shares.

77.    As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff and the other members of the Class have sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision as to whether to tender their shares.

78.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### Claim for Violation of Section 14(d) of the Exchange Act and SEC Rule 14d-9
### (Against All Defendants)

79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

80.     Defendants have caused the Solicitation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

81.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.   Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

82.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation.  Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

83.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

84.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

85.     Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing the statements in the Solicitation Statement to be materially incomplete and/or misleading.

86.     The misrepresentations and omissions in the Solicitation Statement are material to Plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

87.     As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(d) of the Exchange Act and SEC Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other members of the Class have sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision as to whether to tender their shares.

88.     Plaintiff and the Class have no adequate remedy at law.

## COUNT III

**Claim for Violation of Section 20(a) of the Exchange Act
(Against the Individual Defendants)**

89.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

90.     The Individual Defendants acted as controlling persons of Span within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Span, and participation in and/or awareness of the Company's operations and/or

intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

91.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Solicitation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.   The Solicitation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.   They were thus directly connected with and involved in the making of the Solicitation Statement.

93.     In addition, as the Solicitation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Solicitation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

94.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

95.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) of

the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

96.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

97.    Plaintiff and the Class have no adequate remedy at law.

**COUNT IV**

**Claim for Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

98.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99.    As alleged herein, the Individual Defendants have breached their fiduciary duties to Span's stockholders by failing to take steps to obtain the highest value available for Span in the marketplace and, in fact, agreeing to onerous deal protection devices to decrease the chances of obtaining a competing bid, and in issuing a materially false and misleading Solicitation Statement.

100.    As a result of the Individual Defendants' breaches, Plaintiff and the Class will suffer irreparable injury because Span's stockholders will not receive fair value for their equity interests in the Company.

101.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties and will attempt to consummate the Merger, to the irreparable harm of the Class.

102.    Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT V

**Aiding and Abetting the Board's Breaches of Fiduciary Duties**
**(Against Savaria)**

103.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

104.     Defendant Savaria knowingly, or with reckless disregard, assisted, facilitated, and/or participated in, the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred.

105.     As a result, Plaintiff and the Class members are being irreparably harmed.

106.     Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Tender Offer and/or Proposed Transaction;

C.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory or other damages to Plaintiff and the Class;

D.     Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 25, 2017.

Carl L. Stine
Robert S. Plosky
**WOLF POPPER LLP**
845 Third Avenue
Tel: (212) 759-4600
Fax: (212) 486-2093
Email: cstine@wolfpopper.com
rplosky@wolfpopper.com

*Counsel for Plaintiff*

Manning Y. Culbertson, Fed. ID: 5156
Culbertson Law Office, LLC
707 E. North Street
Greenville, SC 29601
Tel: (864) 233-8282
Email: mculbertson@myclawyer.com


s/ Hannah Rogers Metcalfe
Hannah Rogers Metcalfe, Fed. ID: 9943
Metcalfe & Atkinson, LLC
9 Toy Street
Greenville, SC 29601
Tel:  (864) 214-2319
Email: hmetcalfe@malawfirmsc.com